IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JUSTINA HURST o/b/o G.J.D.A., | CASE NO. 5:25-cv-1244 |
| Plaintiff, | DISTRICT JUDGE |
| | CHARLES ESQUE FLEMING |
| vs. | |
| COMMISSIONER OF SOCIAL | MAGISTRATE JUDGE |
| SECURITY, | JAMES E. GRIMES JR. |
| Defendant. | **REPORT AND** |
| | **RECOMMENDATION** |

Plaintiff Justina Hurst filed a complaint against the Commissioner of
Social Security on behalf of her son, G.J.D.A., seeking judicial review of the
Commissioner's decision denying their application for supplemental security
income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and
1383(c). The Court referred this matter to a Magistrate Judge under Local Rule
72.2(b)(1) for the preparation of a Report and Recommendation. Following
review, and for the reasons stated below, I recommend that the District Court
affirm the Commissioner's decision.

1

**Procedural Background**

In January 2023, Hurst filed an application for supplemental security income on behalf of her son, G.J.D.A., alleging a disability onset date of December 19, 2021.[1] *See* Tr. 178, 202.  Hurst alleged disability due to: "ADHD-2016 *trouble focusing *needs aide with him in classrooms sensory process disorder- 2017 depression – 2017 anxiety – 2017 *headaches manic bipolar disorder -2020 *has gotten into fights at school." Tr. 205. The Commissioner denied Hurst's application initially and on reconsideration. *See* Tr. 76, 82.

In August 2023, Hurst requested a hearing. Tr. 86. Administrative Law Judge ("ALJ") Brian Burgtorf held a telephonic hearing in May 2024. Tr. 32–55. Hurst appeared, testified, and was represented by counsel at the hearing. Tr. 37. G.J.D.A. also testified at the hearing. Tr. 50. Later in May 2024, the ALJ issued a written decision, which found that G.J.D.A. was not entitled to benefits. Tr. 14–31.

In June 2024, Hurst appealed the ALJ's decision to the Appeals Council. Tr. 171. In April 2025, the Appeals Council denied Hurst's appeal, Tr. 1, making the ALJ's May 2024 decision the final decision of the Commissioner. Tr. 14–31; *see* 20 C.F.R. § 404.981.

---

[1]      "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

**Medical Evidence**

The ALJ summarized the undisputed medical evidence as follows:

> The claimant's mother reported that the claimant was disabled due to ADHD, with trouble focusing and needing help in the classroom, sensory processing disorder, depression, anxiety, headaches, and manic bipolar disorder with episodes of fighting at school (Exhibit 2E). The claimant's mother further reported that the claimant decompensated without a routine (Exhibit 3E). Additionally, he was limited in his ability to communicate, as he could not answer the telephone and make telephone calls; deliver phone messages; repeat stories he had heard; tell jokes or riddles accurately; use sentences with "because," "what if," or "should have been"; or talk with friends (Exhibit 3E). He also had limitations in his ability to read and understand sentences, comics, and cartoons; read and understand stories, books, magazines, and newspapers; spell words of more than four letters; multiply and divide numbers over 10; understand money and make correct change; and understand, carryout, remember simple instructions (Exhibit 3E).
>
> The claimant had limitations in his ability to ride a bike, jump rope, and play sports. He did not have friends his or her own age, he had difficulty making friends, he did not generally get along well with siblings, and he did not play team sports because he had major meltdowns if he lost. He had difficulty taking care of personal hygiene, washing and putting away clothing, helping around the house, preparing a meal for himself, studying and doing homework, taking needed medication, using public transportation by himself, accepting criticism or correction, obeying rules, and asking for help when needed. He had difficulty working arts and craft projects, finishing things he started, completing homework, completing homework on time, and completing chores most of the time as he would not voluntarily sit and do any work. The claimant's mother further reported that the claimant was

3

taking four different medications to help with focus and staying calm. However, he still had much anxiety that overtook his mood and he could not stay focused and calm, and he got upset sometimes (Exhibit 3E).

At the hearing, the claimant's mother testified that the claimant has ADHD and prior to medication management, he was a little more violent when he was overwhelmed, agitated, or frustrated. He does not like to wait his turn and he does not like to wait in line. He throws things and punches walls. He sometimes does not remember anger outbursts. He is not as violent with medication, but says aggressive and inappropriate things. He broke two televisions, a video game console, and several telephones. He cannot ride a bike, he cannot tie his shoes, he cannot button his pants. He does not brush his teeth, he does not shower unless told, and he does not brush his hair. He does not choose his own clothes. He does not do chores, but will help take out the trash. He can get snacks that do not require cooking. He is never at home alone. He does not do well in school and generally always earned Ds and Fs. He refuses to do the work. He is still participating in counseling at school, which helps with his missing father issues. He has migraine headaches as a side affect from Adderall, and Compazine makes him sluggish. He has migraine headaches two or three times a month. Dr Bromberg indicated he could try a different medication, but they declined to change it. The claimant testified that he likes to play outside for fun and play basketball on a hoop in the driveway. He also watches basketball on television. He likes numbers, so his favorite subject at school is math. He has a friend named Carter at Success class. His favorite book he read is the Hunger Games. He does not do chores because he does not want to.

An unsigned and undated teachers questionnaire when the claimant was in seventh grade, showed that he missed 22 days of school and he had accommodations (Exhibit 4F). Responses to the form

indicated the claimant had only a slight problem in acquiring and using information; and he began his assignments independently and worked ahead. Additionally, if he fell behind due to absences he benefited from the use of checklists to get missing work completed. The claimant had slight to obvious problem with attending and completing tasks, with the comment that he had shown improvement with staying on top of his assignments and using a binder to be reminded to turn in his work. He had no problems interacting and relating with others, no problems moving about and manipulating objects, and no problems caring for himself. The teacher noted that the claimant was motivated to complete work at school and was socializing more when he was taking his medication, but he frequently missed school and did not make up all missing work.

The claimant's 8th-grade teacher stated that the claimant had a slight problem in acquiring and using information as he got additional time to complete assignments and 50-minute resource time with a low student to teacher ratio and he received additional time for testing and quizzes (Exhibit 13E). Additionally, the claimant had a slight to moderate problem in his ability to attend and complete tasks, but he benefited from prompting for work completion and remaining on task (Exhibit 13E).

Psychiatry outpatient progress notes from February 12, 2020, show that the claimant was doing well on medication although it wore off at 2 pm and he was not sure about the effect of his medication (Exhibit 6F-2). He also reported that his mood worsened when he was upset/frustrated/disappointed, but did not discuss further why this occurred. Instead, he became silly, joked and avoided further questions. The mental status examination on May 12, 2020, showed cooperative behavior with okay mood, constricted and flat affect, age-appropriate and intact attention span/concentration, average fund of knowledge/estimated intelligence, and age-appropriate judgment and insight (Exhibit 6F-10).

The claimant's mental health care provider, Daniela Marcella- Bromberg, MD, noted on September 14, 2021, that the claimant was doing the best that he had in years and he had not had behavioral or mood problems in months (Exhibit 6F-25). Additionally, his medication was helping with his moods and he had not had problems with anger or depression in a while. He was not very active and he liked to be by himself; and sometimes he was apathetic about activities in general. He did poorly with changes in routine and his family has adapted to his needs and he spent most of his time living with his grandmother who lived two blocks away from his mother.

On December 8, 2021, around the claimant's alleged onset of disability, mental health treatment notes from the claimant's psychiatrist, Dr. Bromberg, indicated that the claimant's mom reported he was still doing very good, she denied any mood problems or behavioral problems, and he was doing good at school with getting good grades (Exhibit 6F-30). He was sleeping well with medication and his appetite was good, and she denied safety concerns. It was noted that he lived with his mother, her boyfriend, his younger toddler sister, and his older sister; but generally spent much of his time in his grandmother's house because he had lived there prior to the Summer of 2020, and it gave him a sense of stability. Additionally, treatment notes show that the claimant continued to do well with few complaints in March 2022 (Exhibit 6F-34).

Treatment notes from Greenlee Family Center, dated May 4, 2022, indicate that the claimant was enrolled in school-based counseling services since 2016 and his mother reported that his behavior had been stable and pleasant (Exhibit 3F-1). She reported that everything seemed to be working and she wanted him to continue services through the school year. In September 2022, after the claimant returned to school and services, the claimant's mother reported major changes that affected his

6

functioning, such as changing medication, lack of contact with his father, and his sisters medically complicated brain tumor that caused major concern and anxiety in the family (Exhibit 3F-4). At that time, the claimant's mother reported that he was better functioning and less angry, but he was failing to give close attention to details, had difficulty sustaining attention, often did not follow through on instructions, disliked engaging in tasks that required mental effort, was easily distracted and often fidgeting, often left his seat, and did not appear to listen when spoken to (Exhibit 3F-5). He was also suspended recently for hitting a kid who would not get out of his chair.

On November 14, 2022, mental health treatment notes show that the claimant's mother reported that the claimant was having a difficult time in school due to getting overwhelmed, per his IEP teacher but he had run out of Adderall XR so he was getting only Adderall at that time (Exhibit 6F-41). However, he had improvement with return of his Adderall XR. Additionally, he was not able to sit still and concentrate at home and he did not want to do homework; but he was not getting the full dose of Adderall because his mother thought it was too much Adderall. They also lost a bottle of Topamax a few days ago and he had missed his dosage for two days, but his mood and behavior had been good. There was no concern for depression or anxiety and he seemed to be in very good mood with no safety concerns reported.

Psychiatric medication management treatment notes from February 24, 2023, she indicated the claimant was overall doing well, school was going good, and his grades were improving as he was no longer failing (Exhibit 6F-46). He was doing his homework, but he would get distracted by other students being disruptive. He had no new behavioral problems and no new aggressive behaviors. There is no concern for depression or anxiety with no safety concerns, but he was still having some issues falling asleep.

On April 20, 2023, the claimant's mother reported to the claimant's counselor that his behavior at school had significantly improved but he still displayed anger and defiant behavior at home (Exhibit 9F-14). The claimant's counselor referred a transfer of services. but the claimant's mother declined services for the rest of the school year and summer and wanted to resume beginning the next school year September 2023 (Exhibit 9F-16).

At a consultative mental status examination on May 9, 2023, the claimant's mother reported that the claimant "had violent tendencies" (Exhibit 5F). She further stated that his sister had to live with her grandparents due to the claimant physically attacking her. She further reported that he was receiving outpatient mental health treatment with Dr. Bromberg and he received medication services but he had never received inpatient psychiatric treatment. She also reported that he sometimes did not sleep and he experienced mood instability with mood swings, increased irritability, racing thoughts, and engagement in risky and impulsive behaviors. She reported that he did not sleep unless he took medication. She reported that he had significant motor skills delay, had been cruel to animals, wet the bed, and urinated inappropriately in the house. He was not able to hop on one foot or ride a bicycle; he was not able to zip, button, or tie; and he required supervision to complete his personal care and get dressed appropriately. She reported that he got along with others, "depending on his mood", and he had threatened her and his grandparents in the past and he had been physically assaultive towards his older sister. He got extremely upset if his routine was changed for any reason and he had to eat dinner at exactly 5 PM or he had a meltdown. She also reported that he was struggling in school and his grades were decent enough. He had also been involved in fights at school and had been suspended. She reported that he got angry and would "blackout and not remember what he had done." The claimant reported that he threw stuff and hit walls and doors

8

when he became angry and he became angry every day. He also reported that he became violent when he was angry.

The consultative mental status examiner, Claudia Johnson – Brown, PhD, noted that the claimant had poor hygiene and grooming and his motor activity was observed to be greater than normal limits. He was unable to sit quietly throughout the interview and he was banging on doors and walls when his mother was speaking with her. He was unable to state his current address or his mother's cell phone number and he did not know the correct date. His ability to concentrate appeared somewhat impaired, but his immediate recall appeared intact. His recent memory appeared intact and his remote memory appeared significantly impaired. He attempted to be pleasant and cooperative, but at times was angry and irritable and his mood appeared somewhat depressed. His affect was flat and somewhat restricted, and he made normal eye contact. His insight appeared fair to marginal and his judgment appeared fair. Dr. Johnson – Brown found that the claimant had difficulty academically keeping up with same age peers, he had difficulty paying attention and concentrating, he had difficulty interacting with others, and had difficulty completing his personal care. She assessed the claimant with bipolar I disorder, autism spectrum disorder, and attention deficit/hyperactivity disorder.

However, on June 6, 2023, Dr. Bromberg noted that the claimant was overall doing well, he did pretty good in school and passed all of his classes with Cs and Bs, and his ADHD symptoms were well-controlled (Exhibit 6F-50).

A reevaluation of the claimant through his middle school, dated September 14, 2023, indicated that the claimant's mother reported that the claimant needed extra time to complete even small tasks due to problems with focus and he would be overcome with anger or anxiety when pushed or rushed

9

(Exhibit 7F-5). She also reported he had trouble managing his emotions. The claimant's teachers indicated that he was doing well and completing assignments on time, he followed instructions within the classroom, but he had difficulty with showing his work in math and some difficulty in writing (Exhibit 7F-6). Additionally, he sometimes got distracted when working with partners and like to rush through an assignment. On Wechsler Intelligence Scale for Children – V, the claimant had average full-scale intelligence quotient with average fluid reasoning and low average verbal comprehension (Exhibit 7F-8). On the Wechsler Individual Achievement Test – IV, the claimant had average word reading, pseudo-word decoding, reading comprehension, reading, and math fluency in addition to average subtraction (Exhibit 7F-10, 11). However, he had low scores in sentence composition and essay composition and below-average scores in numerical operations, math problem solving, math fluency – multiplication, and mathematics. The claimant's teachers rated his behavior as average regarding externalizing problems, aggression, hyperactivity, and somatization. He was at risk for attention problems and study skills. However, he was also rated as average for learning problems, atypical behavior problems, withdrawal, adaptive skills, adaptability, social skills, leadership, and functional communication (Exhibit 7F-13, 14).

On April 3, 2024, the claimant reported that he was not doing good at school because he was not completing his schoolwork due to poor effort (Exhibit 6F-62). He reported that his ADHD medication worked well in the morning but in the afternoon, he could not concentrate or focus. He had no behavioral concerns, but he was not sleeping well until he increased his trazodone dose to 100 mg instead of 50 mg. The claimant's mother reported that guanfacine helped with the claimant's hyperactivity and he had no concerns with mood/anxiety. His behaviors had not been too bad lately and he had been in a better mood with no new behavioral problems and no new

10

aggressive behaviors. Additionally, he was sleeping well and was weaning off of Topamax successfully. It was further noted that his mother, his mother's boyfriend, and his two sisters lived at his mom's house a few blocks away, but he preferred to stay with his grandmother most of the time. On August 22, 2023, the claimant was behaviorally doing really good and he had started school (Exhibit 6F-55). He still had issues with sleep, but he had normal energy during he day and he did not take naps. There was some concern for inattention but the claimant's mother wanted to wait and see before making medication adjustments (Exhibit 6F-57).

Tr. 20–25.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on November 23, 2009. Therefore, he was an adolescent on January 5, 2023, the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since January 5, 2023, the application date (20 CFR 416.924(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairments: Attention Deficit/Hyperactivity Disorder (ADHD), bipolar disorder, anxiety, sensory processing disorder, Oppositional Defiant Disorder (ODD), and autism spectrum disorder (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

11

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. I find that the claimant has not been disabled, as defined in the Social Security Act, since January 5, 2023, the date the application was filed (20 CFR 416.924(a)).

Tr. 18–27.

**Standard for Disability**

A claimant is entitled to receive Supplemental Security Income benefits if the claimant establishes the existence of a disability. 42 U.S.C. § 1382(a). "Disability" in the case of a claimant under age 18 is defined as "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

An ALJ is required to follow a three-step sequential analysis to make a disability determination for a child claimant:

1. Is the claimant engaged in any substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the claimant is not disabled.

20 C.F.R. § 416.924(a)–(d).

To determine under step three whether a claimant's impairment functionally equals a listing, the ALJ considers six domains of functioning: (1) "[a]cquiring and using information"; (2) "[a]ttending and completing tasks"; (3) "[i]nteracting and relating with others"; (4) "[m]oving about and manipulating objects"; (5) "[c]aring for yourself"; and (6) "[h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i)–(vi); *see Smoot v. Comm'r of Soc. Sec.*, No. 5:22-cv-1235, 2023 WL 1413097, at *12 (N.D. Ohio Jan. 31, 2023); *see also M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 855 (E.D. Mich. 2012) (citing 20 C.F.R. § 416.926a). To establish a functional impairment equal to a listing, the claimant must show an "extreme" limitation in one domain or a "marked" impairment in more than one domain. 20 C.F.R. § 416.926a(d). As in any Social Security disability case, the claimant has the burden of proof. 20 C.F.R. § 416.912(a); *see Woodall v. Colvin*, No. 5:12-cv-1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013); *Tate ex rel. Tate v. Comm'r of Soc. Sec.*, 368 F. Supp. 2d 661, 663 (E.D. Mich. 2005).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*

13

*v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at 103 (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Hurst argues that the ALJ's failed to adequately explain his consideration of an opinion provided by the consultative examiner, Dr. Johnson-Brown. *See* Doc. 8, at 1.

14

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Although an ALJ must discuss the supportability and consistency factors, 20 C.F.R. § 416.920c(a), the ALJ need not use the magic words *supportability* and *consistency*. *See Cormany*, 2022 WL 4115232, at *3 (collecting cases). Here, Hurst provides little discussion with regard to whether the ALJ discussed the substance of *supportability* and *consistency*. Instead, Hurst generally asserts that the "ALJ did not provide any reasoning for how Dr. Johnson Brown's opinion was not supported by her own examination" and that the "ALJ was required to evaluate how [Dr. Johnson-Brown's findings] supported Dr. Johnson-Brown's exam, but he included no discussion whatsoever of supportability in his decision." Doc. 8, at 11–12. The ALJ's decision belies this assertion

The ALJ began his discussion of Dr. Johnson-Brown's opinion by observing that she:

> noted that the claimant had poor hygiene and grooming and his motor activity was observed to be greater than normal limits. He was unable to sit quietly throughout the interview and he was banging on doors and walls when his mother was speaking with her. He was unable to state his current address or his mother's cell phone number and he did not know the correct date. His ability to concentrate appeared somewhat impaired, but his immediate recall appeared intact. His recent memory appeared intact and his remote memory appeared significantly impaired. He attempted to be pleasant and cooperative, but at times was angry and irritable and his mood appeared somewhat depressed. His affect was flat and somewhat restricted, and he made normal eye contact. His

16

> insight appeared fair to marginal and his judgment
> appeared fair. Dr. Johnson-Brown found that the
> claimant had difficulty academically keeping up
> with same age peers, he had difficulty paying
> attention and concentrating, he had difficulty
> interacting with others, and had difficulty
> completing his personal care. She assessed the
> claimant with bipolar I disorder, autism spectrum
> disorder, and attention deficit/hyperactivity
> disorder.

Tr. 23–24.

The ALJ then compared Dr. Johnson-Brown's observations to other evidence. *See id*. at 24. First, Dr. Johnson-Brown's observations were inconsistent with Dr. Bromberg's observation that G.J.D.A. "was overall doing well," in that "he did pretty good in school and passed all of his classes with Cs and Bs, and his ADHD symptoms were well-controlled." *Id*. at 24. The ALJ also contrasted Dr. Johnson-Brown's observations with academic evidence, including teacher reports that G.J.D.A. "was doing well and completing assignments on time, … followed instructions within the classroom, but … had difficulty with showing his work in math and some difficulty in writing." *Id*. And although G.J.D.A. sometimes became "distracted when working with partners and like[d] to rush through an assignment[,]" his teachers "rated his behavior as average regarding externalizing problems, aggression, hyperactivity, and somatization." *Id*. And although G.J.D.A. was thought to be "at risk for attention problems and study skills," his teachers "rated" him "as average for learning problems, atypical behavior problems, withdrawal,

17

adaptive skills, adaptability, social skills, leadership, and functional communication." *Id.*

Finally, the ALJ noted that Hurst had reported positive information, including that certain medication "helped with [G.J.D.A.'s] hyperactivity and [that] he had no concerns with mood [or] anxiety. *Id.* Further, "[h]is behaviors had [recently] not been too bad[,] he had been in a better mood with no new behavioral problems and no new aggressive behaviors," and "he was sleeping well and was weaning off of Topamax successfully." *Id.*

Moving on, the ALJ observed that during:

> a consultative mental status examination [i]n May 2023, [with Dr. Johnson-Brown][2] the claimant and his mother reported that the claimant had aggressive and assaultive behavior, etc. However, treatment notes from February 2023, indicate the claimant was overall doing well; school was going good and he was no longer failing classes (Exhibit 6F-46). He was not being disruptive, but he was easily distracted when other students are being disruptive, and he had no new behavioral problems, and there were no safety concerns reported. It was noted that he stayed with his grandmother most of the time, which was not consistent with the mother's testimony that his sister had to go to her grandparent's home for safety. Additionally, treatment notes immediately following the consultative mental status examination indicated again that the claimant was overall doing well, doing good in school, passing all his classes, and his ADHD symptoms were well-controlled. The reports at the consultative mental status examination were far

---

[2]    *See* Tr. 422–29.

different from the treatment notes and this inconsistency does not support the claimant's allegations of debilitating mental health symptoms. Treatment notes show one episode where the claimant got angry and broke a TV. It also indicated this was not normal behavior for him and this was an isolated incident. He was generally noted not to have aggressive behavior. Medication management notes from the claimant's psychiatrist, did not show any complaints of violence toward siblings. Additionally, in April 2024, the claimant's psychiatrist noted that the claimant had no recent behavioral problems and his medication therapy throughout the years had controlled his aggressive/violent behaviors with no current safety concerns (Exhibit 8F). The subjective reports from the claimant's mother to Dr. Johnson – Brown, were far different than subjective reports of the claimant's behavior and activities to his treating psychiatrist.

Tr. 25.

Given the above, it is apparent that although the ALJ did not use the magic words *supportability* or *consistency*, he complied with applicable regulations. The ALJ compared Dr. Johnson-Brown's opinion with medical and other evidence found elsewhere in the record, i.e. consistency, and his decision shows that he considered how the subjective reports within Dr. Johnson-Brown's opinion did or did not support her opinion, i.e. supportability. *See* Tr. 25. For instance, the ALJ showed how he considered the consistency of Dr. Johnson-Brown's opinion by stating: "At a consultative mental status examination on May 2023, the claimant and his mother reported that the claimant had aggressive and assaultive behavior, etc. *However*, treatment

19

notes from February 2023, indicate the claimant was overall doing well; school was going good and he was no longer failing classes (Exhibit 6F-46)." Tr. 25 (emphasis added). By comparing the consultative examination in May 2023 with treatment notes from another provider in February 2023, as evidenced by use of the word *however*, the ALJ showed that he considered the consistency factor with regard to Dr. Johnson-Brown's opinion. *Id.*; *see also* Tr. 23–24.

Additionally, the ALJ showed that he considered the supportability of Dr. Johnson-Brown's opinion by explaining that the "subjective reports from the claimant's mother to Dr. Johnson-Brown" and "[t]he reports at the consultative mental status examination," both of which are solely detailed within the consultative examiner's report, did "not support the claimant's allegations of debilitating mental health symptoms." Tr. 25. In sum, a review of the ALJ's evaluation, illustrates that he considered the supportability and consistency of Dr. Johnson-Brown's opinion as required—albeit without using the magic words. *See* Tr. 25; 20 C.F.R. § 416.920c(b)(2).

As Hurst identifies, the ALJ discussed Dr. Johnson-Brown's opinion in conjunction with the summary of medical evidence and then proceeded to explain how he "considered the medical opinions in accordance with the applicable regulations. *See* Doc. 8, at 9. For this reason Hurst appears to—in addition to her claim that the ALJ failed to discuss supportability and consistency—challenge the structure of the ALJ's decision. But the ALJ wasn't required to discuss the opinion evidence in a particular order or organize his

discussion of the opinions so that he discussed all of them in one section— although that would have been helpful.

Because the ALJ's decision must be viewed as a whole, his discussion discounting a medical opinion in conjunction with discussion of evidence found elsewhere in the ALJ's decision satisfies the articulation requirement for opinion evidence. *See, e.g., Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 970 (6th Cir. 2021) (the ALJ's brief explanation discounting a medical opinion, in conjunction with the ALJ's discussion of the doctor's treatment notes and exam findings elsewhere in the decision, satisfied the articulation requirement for opinion evidence); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (same)[3]; *Kraig v. Kijakazi*, No. 1:21-cv-1253, 2022 WL 4232692, at *9 (N.D. Ohio Sept. 14, 2022) (ALJ's evaluation of opinion evidence read "in the context of the decision as a whole" contained sufficient articulation for discounting the opinion) (collecting cases). When read as a whole, the ALJ discussed the supportability and consistency of Dr. Johnson-Brown's opinion. Hurst's sole argument, thus, does not provide a basis for remand.

---

[3]    In *Chicora* and *Crum*, the former regulations governing treating physician opinions applied to the claimant's disability application. *Chicora*, 852 F. App'x at 969–70; *Crum*, 660 F. App'x at 456. Those former regulations were more demanding than the current ones. *See, e.g., Kraig v. Kijakazi*, No. 1:21-cv-1253, 2022 WL 4232692, at *8 (N.D. Ohio Sept. 14, 2022). So there is nothing to suggest that the approach endorsed under the former regulations— to read the ALJ's decision as whole—wouldn't apply under the current regulations. *See id.*

**Conclusion**

For the reasons stated, I recommend that the Commissioner's decision be affirmed.


Dated: February 9, 2026                    */s/ James E. Grimes Jr.*
                                           James E. Grimes Jr.
                                           United States Magistrate Judge


# OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).